UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


STEVEN TAUZIN                              CIVIL ACTION NO. 11-cv-0696

VERSUS                                     JUDGE FOOTE

WARDEN, LOUISIANA STATE                    MAGISTRATE JUDGE HORNSBY
POLICE


## REPORT AND RECOMMENDATION

**Introduction**

Steven Tauzin ("Petitioner"), Noe Stephan, and Misty Ellis, became suspects in connection with the murder of tennis coach Gilbert W. Moore.  The evidence indicated that Mr. Moore came home and surprised the three suspects, who were burglarizing his Shreveport home, and Moore was beaten to death with a hammer and crowbar.  Noe Stephan cooperated with the district attorney by providing information in exchange for a grant of use immunity.  He pleaded guilty to attempted aggravated burglary and received a 15-year-sentence.[1]

Petitioner rejected a plea offer of manslaughter and 40 years and proceeded to trial. Misty Ellis testified against him.  Petitioner was convicted, by an 11-1 vote, of second-degree murder and received a mandatory life sentence.  Misty Ellis was not charged in connection

---

[1]Stephan's federal habeas corpus petition was denied on the merits.  Stephan v. Warden, 2010 WL 2218643 (W. D. La. 2010).

with the murder, and she was later allowed to plead guilty to a misdemeanor to resolve a pending felony drug charge.

Petitioner's conviction was affirmed on direct appeal. State v. Tauzin, 880 So.2d 157 (La. App. 2d Cir. 2004). Petitioner also pursued a post-conviction application in state court. He now seeks federal habeas relief on several grounds. For the reasons that follow, it is recommended his petition be denied.

**Trial Evidence**

Misty Ellis testified that she knew Mr. Moore and had lived with him "as friends" at his home until they had a falling out in 1998. She then moved in with Petitioner and Mr. Stephan. The three of them were eating and drinking one night at a Bossier City bar, "The Locker Room," when they saw Mr. Moore. Ms. Ellis mentioned to Petitioner and Stephan that she used to live with Moore and that he still had some of her "stuff" at his home.

Ellis, Petitioner, and Stephan later went to a strip club, "The Centerfold," so Ellis could apply for a job. She came up with the idea for the three of them to break into Moore's home so that she could get her social security card, which she needed to secure employment, and other personal belongings such as clothing.

Ellis testified that Petitioner suggested they steal gloves from a hospital to avoid leaving fingerprints, and they did. They also changed into dark clothing. Petitioner armed himself with a crowbar. They drove past the Locker Room and saw that Moore was still there.

Ellis testified that the group went to Moore's house, where Petitioner climbed the fence and gained entry by breaking a window.  He let the others in the home through a side door.  The three looked for Ellis' belongings, but Moore came home to find them and was upset over the broken window.  Ellis testified that she was in a hiding place but heard arguing and a "big thud," followed by gargling noises.  When things quieted down, she came out and saw the victim face down on the floor, with Petitioner standing a foot away holding a hammer.  Stephan was also nearby holding a crowbar.  Ellis quoted Petitioner as saying he "needed to take out some frustration," and she said he wiped his forehead with paper towels and attempted to wipe some footprints from the floor.  For some reason, Petitioner filled a syringe with cooking oil, pulled down the victim's pants, and stuck the syringe in the victim's buttock.

The group took some items from the victim's pockets and home.  On their way back to Bossier City, they stopped on the Shreveport-Barksdale bridge.  Petitioner threw into the river the crowbar, their gloves, some of their clothing, and other items.

Petitioner soon left town.  Melissa Quick, his former fiancée, testified that he showed up at her home in Florida and said he needed to get away from Shreveport because he was "in trouble" because "I think I killed someone."  Quick's current fiancé said Petitioner had to leave, and he did.

Misty Ellis was interviewed by police and denied any knowledge of the murder.  She and Noe Stephan then went to Mexico and soon sent word to Petitioner to join them.  He did, but they returned to the Shreveport-Bossier area within a couple of weeks to get some

money.  They all returned to Mexico and got an apartment, but they eventually returned to the Shreveport area, and Petitioner was arrested.

Robert Catts, a friend of Petitioner, testified that Petitioner called him during the time the group was on the run and said he needed a place to stay.  Petitioner showed up with Ellis and Stephan.  He said they had been to Mexico and the police were trying to pin the murder of the tennis coach on them, so they needed to get away to get their alibis together.  The group went back to Mexico after a couple of weeks.  Petitioner continued to call Catts.  He had denied their involvement in the murder, but he made an incriminating statement to Catts during one call about the weapons being in the river.  He also once pointed out the location of the murder when they drove by the area.  Catts contacted the authorities, which led to the arrests.

The owner of the Locker Room testified that the victim, Moore, was a regular customer and friend.  Moore had been at the bar the night of the murder.  Misty Ellis and her group were also in the bar that evening, but he did not recall seeing anyone from their group speak to the victim.

Two crumpled bundles of paper towel were found near the victim.  One contained a couple of drops of blood that DNA testing linked to Petitioner.  The towel also had bloodstains linked to the victim.  The autopsy showed that the victim received between 12 and 18 separate blows to the head that crushed his skull.  Between four and six of them would have been lethal had they been inflicted separately.  Most of the head wounds were consistent with the claw hammer found at the scene.  The victim's body also indicated

approximately six blows to the lower back and forearms that were consistent with infliction by a long, slender object like a crowbar.

Petitioner testified at trial and admitted the trio broke into the victim's home.  He said that he was drunk and mostly sat on the couch while Ellis and Stephan searched the home. Petitioner said that when they heard the victim come home, Stephan hid behind a door with a crowbar, and Petitioner ducked into a closet.  Petitioner said that when he returned to the kitchen he saw Stephan beating the victim, so he walked out.  When he returned again, Ellis was screaming at the victim and beating him with the crowbar.  Blood spattered onto Petitioner's face, so he wiped his head with the paper towel.  Petitioner said Stephan then took the crowbar, looked at Petitioner, and said, "All right now, you hit him because we are all going to be in this together."  Petitioner said he complied by hitting the victim once with the hammer in the body or arm area.  He then left, and the other two followed him out the door.

Petitioner testified that it was Stephan who ordered they stop at the top of the bridge and then threw their clothes and the crowbar in the river.  Petitioner said he tried to get away from Ellis and Stephan by going to stay with a friend, but they nonetheless were able to convince him to join them in Mexico.  He said he ran after the murder because he was scared.

**Deficient Indictment**

Petitioner was originally indicted for first-degree murder. Tr. 11.  A Louisiana district attorney may amend a grand jury indictment to charge a lesser offense.  An amended indictment was filed on November 14, 2000 that charged Petitioner with the second-degree

murder of Gilbert Moore in violation of La. R.S. 14:30.1. Tr. 10A. The record the State filed with this court includes another amended indictment dated February 4, 2003 that also charges Petitioner with second-degree murder, cites the statute for the crime, and asserts that on a particular date Petitioner killed Mr. Moore when he had specific intent to kill and inflict great bodily harm "and" while engaged in the perpetration and attempted perpetration of certain felonies "even though he had no intent to kill or inflict great bodily harm."

Petitioner argues that the actual amended indictment that was part of the state appellate record is slightly different. He attaches it to his traversal (Doc. 14) as an exhibit. That amended indictment refers to the original grand jury indictment in April 2000 and charges that Petitioner committed "the following criminal offenses in that he" on a certain date killed Mr. Moore as described in the earlier amendment. The amended indictment submitted by Petitioner does not cite the statute for the crime, and its assertions that the killing was with intent to kill "and" while engaged in certain felonies even though without intent to kill are not wholly consistent with the provisions of the statute.

Petitioner argued in his post-conviction application that the state court lacked jurisdiction because the amended indictment failed to state what offense he was being charged with. He contended that this violated the Sixth and Fourteenth Amendments. Tr. 2272-74. The State responded and quoted the relevant language in the amended indictment that Petitioner contends was the final version. The State argued that the indictment, despite its imperfections, was adequate to comply with state law, and Petitioner had no doubt he was on trial for second-degree murder. Tr. 2297-99.

Louisiana Code of Criminal Procedure Art. 464 provides that the indictment is to state the citation of the statute charged, but error in the citation or its omission is not ground for dismissal of the indictment or reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.  The trial court pointed to that article and denied the claim. Tr. 2428-29.  The appellate court summarily denied this claim, along with some others, on the grounds that Petitioner "failed to meet his burden of proving that the requested relief should be granted."  Tr. 2488.  Petitioner included this argument in an application to the Supreme Court of Louisiana, which denied relief without comment.

The sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction.  McKay v. Collins, 12 F.3d 66, 68 (5th Cir. 1994).  And "[w]here the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue."  Id.  In other words, when the sufficiency of the indictment was squarely presented to the highest court of the state, and that court held that the trial court had jurisdiction, the sufficiency of the indictment is a question foreclosed to federal habeas review.  Evans v. Cain, 577 F.3d 620, 624 (5th Cir. 2009).  "An issue may be squarely presented to and decided by the state's highest court when the petitioner presents the argument in his application for postconviction relief and the state's highest court denies that application without written order."  Id.

Petitioner argues that the trial court misunderstood his argument as complaining about the lack of a citation to the statute.  Petitioner says his actual argument is that the wording

in the amended indictment simply does not describe a crime that is defined by the Louisiana murder statutes.  His argument is not unreasonable, but he presented it squarely to all three levels of the state judiciary, and they deemed the indictment sufficient under state law.  There is also no doubt that Petitioner was aware from the prior amendments and the entire context of the pretrial and trial proceedings that he was being charged with second-degree murder. Habeas relief is not available on this claim.

**Reasonable Doubt Instruction**

### A. The Instructions

Petitioner argued on post-conviction that the trial judge's reasonable doubt instruction was improper and reduced the State's burden below what is required by due process.  The judge instructed that the accused is presumed to be innocent until his guilt has been established beyond a reasonable doubt at trial.  He added that the "presumption of innocence is another way of saying that a person is not guilty until proven otherwise beyond a reasonable doubt."  The judge repeated that the burden was on the State to prove every essential element of the crime charged, but he added that "this does not mean that the State must prove beyond a reasonable doubt such facts that may be connected with the crime charged but are not essential elements thereof."  He later added that reasonable doubt "does not mean all possible doubt but means doubt based upon a reason."  The jury was told that if there was doubt in their mind as to the accused's guilt "which doubt is based upon a reason or for which doubt you can express a reason then the defendant is not guilty."  Tr. 2034-36.

### B. State Court Decision; Habeas Burden

The trial court denied the post-conviction claim on the grounds that it was waived when the defense did not raise an objection.  Tr. 2429.  The appellate court summarily rejected this claim, along with others, on the grounds that Petitioner "failed to meet his burden of proving that the requested relief should be granted."  This last reasoned state court opinion did not expressly rely upon a procedural bar, so that defense is probably not available.  Ylst v. Nunnemaker, 111 S.Ct. 2590 (1991).  The summary denial of the claim by the appellate court appears to be sufficient to constitute an adjudication on the merits within the meaning of 28 U.S.C. § 2254(d).  Cullen v. Pinhoster, 131 S.Ct. 1388, 1402 (2011).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.  Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011).  A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a

way that is not only incorrect but objectively unreasonable.  Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

When there has been a summary denial, the petitioner may meet his burden under the first prong of Section 2254(d) only by showing that there was "no reasonable basis" for the state court's decision.  The federal habeas court must determine what arguments or theories could have supported the summary decision, and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  Pinholster, 131 S.Ct. at 1402, citing Harrington v. Richter, 131 S.Ct. 770, 786 (2011).

### C. Analysis

Petitioner's federal petition invokes In re Winship, 90 S.Ct. 1068 (1970) which held that the due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  The only other Supreme Court decisions Petitioner cites are Cage v. Louisiana, 111 S.Ct. 328 (1990) and Victor v. Nebraska, 114 S.Ct. 1239 (1994).

Cage held that a reasonable doubt instruction ran afoul of Winship.  The Court found troublesome phrases that equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt" and a statement that a verdict of guilty could be returned based on a "moral certainty" of guilt.  The combination of those terms, when the charge was read as a whole, resulted in a deficient instruction.  Victor upheld a jury charge that contained some, but not all, of the three suspect phrases assessed in Cage.  The suspect phrases in Victor did

not impermissibly lower the State's burden because the overall instructions clarified the meaning of the terms in a way consistent with reasonable doubt.  See Cockerham v. Cain, 283 F.3d 657, 662 (5th Cir. 2002) (discussing both cases).

None of the suspect phrases appear in the jury instructions given in this case. Petitioner argues that the instructions were confusing or allowed the jury to find guilt without proof beyond a reasonable doubt of the underlying felony.  Petitioner's arguments are not a reasonable interpretation of the instructions which, overall, convey a reasonable instruction of the law and did not improperly relieve the State of proving any element beyond a reasonable doubt.  More important, Petitioner has not shown that the state court's adjudication of this claim was contrary to or an unreasonable application of a clearly established holding of the Supreme Court.  Habeas relief is not available on this claim.

**Limit on Cross-Examination**

The State filed a motion in limine before trial that asked to limit the defense from cross examining Misty Ellis about her employment as a stripper, her use of drugs, her sexual past, psychological care, and financial situation.  The State relied on L. C. E. art. 608 regarding attacks on a witness's reputation.  The trial judge granted the motion, with the exception of a request to exclude questions about Ellis' ability to drive or possess a license, and it clarified that prior inconsistent statements could be discussed.

Despite the ruling, defense counsel was able to get Ellis to admit on cross-examination that she hid drugs in the victim's house, took a valium and smoked a joint before she talked to the police, had tattoos, and had worked at The Centerfold and Action Central

(which are well known in the area as strip clubs).  Tr. 1707-24.  Ellis even stated on direct that on the night of the crime the group went to The Centerfold, which was "a strip club where I was going to get a job." Tr. 1676.  Petitioner nonetheless complained on appeal that the court had improperly limited his right to conduct cross-examination.

The Sixth Amendment guarantees the right of an accused to be confronted with the witnesses against him.  The main purpose of confrontation is to provide the defendant the opportunity of cross-examination, which is the principal means by which the believability of a witness and the truth of her testimony are tested.  Davis v. Alaska, 94 S.Ct. 1105 (1974). That does not mean the Constitution prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a witness.  Judges retain wide discretion to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, or repetitiveness.  Delaware v. Van Arsdall, 106 S.Ct. 1431, 1435 (1986).  A violation of the right to impeach a witness is subject to harmless error analysis.  Van Arsdall, 106 S.Ct. at 1438.

Defendant argued on appeal that he should have been able to cross-examine Ellis about her history of nude and topless dancing, drug use, and problems caused by lying in several situations.  The appellate court acknowledged the Davis v. Alaska standard and, with it in mind, assessed the evidence under state evidence rules.  It determined that the trial judge did not abuse his discretion regarding the admissibility of the evidence of drug use, past sexual activity, and alleged "habitual lying."  The defense could have attacked Misty's general reputation for truthfulness, but it was not entitled to present evidence of particular

acts calculated to show bad conduct.  And, the appellate court noted, the defense managed to present much of the subject matter to the jury despite the trial court's rulings.  State v. Tauzin, 880 So.2d at 162-65.

The question under Section 2254(d) is not whether this court believes the state court's determination of the Sixth Amendment issue was incorrect but whether that determination was unreasonable, which is a substantially higher threshold.  Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007).  Petitioner has not pointed to a particular Supreme Court holding that would clearly require the trial court to admit such evidence, so the ruling must be assessed under the general standards discussed above.  When a state court has applied such general standards, it has more latitude to which this court must defer. " Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

Reasonable persons might debate whether the defense should have been able to further explore some of the issues on which it has to cross-examine Ellis, but the fact that it is debatable means that habeas relief is not permitted.  Even if the federal court believed that the limitation was so great as to be an unreasonable application of clearly established Supreme Court precedent, Petitioner would still have to overcome the harmless error standard by showing that the limitation had a substantial and injurious effect on the verdict. Horn v. Quarterman, 508 F.3d 306, 322 n. 24 (5th Cir.2007).  There is no reason to believe that additional questions about Ellis' work and social history would have changed the verdict.

**Limit on Cross-Examination; <u>Brady</u> Claim**

### A. The State Court Proceedings

Petitioner argued in his post-conviction application that he was denied the right to cross-examine Misty Ellis about her "deal" with the State and that the State falsely represented that there was no favorable consideration or deal extended in exchange for Ellis' trial testimony.  Defense counsel first raised the issue when he filed a Motion to Reveal the Deal (Tr. 515-17) that demanded production of any deals with prosecution witnesses, including unwritten arrangements.  A second, similar motion was also filed.  Tr. 892-94.  The State represented in a written response that all evidence favorable to the defendant "including any promises or offers of immunity, leniency, cooperation or any other benefit whatsoever which were made to any witness in connection with this case will be provided to the defendant as provided by law."  The State then disclosed that, upon perpetuation of her testimony, the State would agree to a reasonable bond for Ellis in a pending drug case in which she was then being held without bond.  The State added that Ellis "has **not** been granted any kind of immunity from prosecution or 'deal' in the instant case nor any kind of 'deal' in [the drug case]."  The State promised to honor a continuing duty to disclose such information.  Tr. 508-09.  A supplemental response added that Ellis had been given use immunity in exchange for a statement concerning her knowledge of the murder.  The statement could not be used against her, but she could be prosecuted for the murder using independent evidence.  The State again emphasized that Ellis "has **not** been granted any kind

of immunity from prosecution or 'deal' in the instant case nor any kind of 'deal' in [the drug case]."  Tr. 561-62.

Misty Ellis testified for the State at a preliminary examination.  Defense counsel asked her about her arrest on possession with intent to distribute Schedule II drugs and whether she anticipated serving time on that charge.  She said she was concerned.   The following exchange then took place:

> Q    What do you expect to happen as a result of your testifying yesterday and today in this case?  What do you expect to happen on your drug case?
>
> A    I don't know.
>
> Q    What do you expect to happen?
>
> A    What I'm hoping for is they give me like a year or something and then I have to do two for one, and so I only have to do six months, and then I can just stay in here for like three more months or something.
>
> Q    You're hoping for a reduced sentence?
>
> A    Yes, it's my first offense so I'm thinking they might drop the intent to distribute.  And also I'm trying to get an affidavit signed.
>
> Q    Isn't it a fact that's not correct, you're hoping for something totally different, aren't you?
>
> A    Like what?
>
> Q    That the charge could be dropped because of illegal search and seizure.
>
> A    I take the Fifth on that.

Defense counsel attempted to introduce a letter written by Ellis to Noe Stephan on that subject, and it was that letter to which Ellis' attorney raised a Fifth Amendment objection. The court ruled that the letter was not admissible.  Defense counsel then returned to questioning Ellis and had her agree that her situation would improve dramatically if the charges against her were thrown out.  The prosecutor objected that there was no evidence of a deal, and Ellis said, "I take the Fifth."  Her counsel supported that response, but the basis for it was not fully explored.  Tr. 1088-90.

Defense counsel raised the issue again at the beginning of trial.  Assistant District Attorney Michael Pitman stated that Misty Ellis was never arrested or charged in connection with the murder "so from that standpoint there's no real deal."  He added that she was not going to be indicted as far as he was concerned "on this particular matter."  He added that she did have a charge pending in the same district for manufacture of methamphetamine that was set for trial in a few weeks, but Pitman said he had told Ellis "in no uncertain terms that I have no authority nor am I reducing, dismissing, or changing that particular charge in any manner whatsoever."  He added, "I'm not prosecuting that case" but as far as he knew there was "nobody in this office who has told her that that case will be reduced or dismissed or anything else based on whether she testifies or not."  Tr. 1536-38.

Judge Leon Emanuel then inquired whether Mr. Pitman was making his representation personally or on behalf of the D.A.'s Office and the State.  Pitman said that he spoke only for his personal knowledge, and the judge said that would not be good enough because the ADA represented the State and must speak to whether there were any deals offered by the

State.  Pitman agreed that the defense was entitled to information concerning any charges arising out of the homicide but argued the defense was not entitled to know the disposition of any other charge unless it was directly related to the witness's testimony in this case.  The court questioned the correctness of that position and noted that there are often discussions in one section of the court that can relate to matters in other sections.  He made specific reference to the pending drug charges and demanded that at some point the State, not the prosecutor personally, respond to the motion.  Tr. 1538-42.  Pitman stated that he had personally told Ms. Ellis that there were no deals coming out of the drug offense, but he would check and see if anyone else had made any deals.  Tr. 1544.  Defense counsel pointed out that the drug charge had been pending in excess of 40 months, and a co-defendant had already been tried and sentenced.  Id.

> ADA Pitman later reported to the court as follows:
>
> MR. PITMAN: With regard to the testimony of Misty Ellis.  We talked yesterday on the record about any deal in response to reveal the deal motion filed by defense counsel.
>
> Yesterday I talked with Larian Hillman the assistant district attorney now handling Misty Ellis' drug case in the drug section of the Caddo D.A.'s Office. He said that there are no deals pending as a result of anything taking place in this particular case.  I made it clear to him that there were no deals.  She was not to be given any leniency regardless of her involvement or testimony or cooperation in this particular case.
>
> I also talked with Ms. Ellis about that yesterday, again, and made it clear to her again that there are no deals, no offers, no leniency coming from the D.A.'s office as a result of her cooperation in this case.  She fully understands that. It's my understanding her trial is set in Section 5, the drug section for May sometime, I believe it is.  So that is, again, in response to the motion, there are

no deals.  She was not ever indicted in this case, but with regard to any drug pending files or anything else, there are no deals.

Defense counsel responded: "That's acceptable, your Honor." Tr. 1556-57. Defense counsel did not cross-examine Ellis about her pending drug charges, any deal, or any expectation of leniency in connection with those charges.

Petitioner's post-conviction application Claim No. 5 was that the trial court limited his cross-examination of Ellis by allowing her to invoke the Fifth Amendment at the preliminary hearing and not answer questions about a possible deal. Tr. 2286-88.  The claim was rejected by the trial court, but the appellate court, which described the claim as one for prejudice by limitation on the right to cross-examine Ellis, remanded for further review on the merits. Tr. 2488-89.  The court set a hearing and began by questioning whether Petitioner was contending the court limited questioning about any deal.  Petitioner's counsel admitted that the issue had "become extremely out of focus" in that the defense was now focused on "whether or not there was actually a deal for Misty Ellis and whether or not the defense at the time had access or knowledge of any deal that may have been pending from Misty Ellis." The court stated that its reading of the trial transcript did not show that the court had prohibited defense counsel from engaging in such questioning at trial.  Petitioner's attorney agreed.  Tr. 2900-01.

Kurt Goins was the first witness at the hearing.  He had more than 20 years of experience with the public defender and ordinarily handled homicide cases.  He was assigned to Ellis' drug case once it was learned she was interviewed in connection with the murder.

He learned from the prosecution that Misty was a witness in which they were interested, and he was able to obtain use immunity for her.  He did not specifically recall her bond arrangement, but he generally recalled that she had been in jail and did get released after her preliminary testimony.  He agreed that there was no written deal with the State before Petitioner's trial.  When asked if a deal was ever offered regarding her testimony, Goins said: "The term I've used for that ... , I call it a non-deal deal."  He explained that Misty was "not offered anything specifically on her drug case by the State in return for her testimony," but she had a drug case pending, she was on bond, and her case was continued a number of times.  "And the plea agreement she reached was after [Petitioner's] trial, hence my term a non-deal deal."  Ellis later pleaded guilty to a misdemeanor charge of possession of drug paraphernalia and was sentenced to 30 days with credit for time served.  Goins recalled that the co-defendant received a 10-year sentence.  The State pointed out that the case against the co-defendant was stronger.  Goins was asked if ADA Pitman ever contacted him or Ellis to say there was to be no leniency given in exchange for her testimony.  Goins said he was not aware of such a communication.

After Petitioner was convicted, Goins wrote a letter to ADA Pitman and asked if the State intended to use Ellis in its possible trial against Noe Stephan.  Goins stated in the letter that he needed to know because he was trying to resolve the drug case.  Goins was asked at the hearing if there was a hope that Ellis would receive some leniency if also called in Stephan's case.  Goins said he would go further and say there was an expectation of leniency given her testimony at Petitioner's trial and willingness to testify against Stephan.  He

recalled that he also wrote ADA Larrion Hillman, who was assigned to the drug case.  He proposed a plea bargain and gave reasons including the substantial assistance Ellis offered through her testimony against Petitioner.  Tr. 2902-28.

ADA Hillman was shown the file for the drug case and notes from another prosecutor who handled the case before him.  The prior prosecutor had written that she discussed with the first assistant what to do with Ellis after her co-defendant pleaded guilty.  Among her notes was: "I have made no guarantees or indications to Kurt as to what will happen with this case after she testifies in the Stephan and Tauzin cases.  She is testifying without any deals." Hillman also read a note dated May 19, 2003 that indicated he spoke to the First Assistant and ADA Pitman about the case.  He could not recall the content of the discussion.  He said it was not his usual practice to discuss any offers with Pitman, who worked in a different section, so it would have been very unusual to discuss a plea offer with him.  He had no notes indicating that Pitman told him that there were to be no deals or leniency given to Ms. Ellis for her testimony in Petitioner's case.  He said that if there had been a discussion "regarding an offer or a flat no offer" he would have noted it in the file.  Tr. 2929-42.

The court heard extensive argument and said a ruling would issue after a review of the exhibits.  The court clarified that the claim was being treated as including an assertion there was a deal and not just a denial by the court of the ability of counsel to ask about a deal. The court added that based on what had been received so far at the hearing there had been a failure to show that there was a deal or an agreement prior to the trial.  Tr. 2943-56.  The court later issued a written ruling that summarized the evidence and determined that the State

did not offer a plea agreement or deal to Misty Ellis in exchange for her trial testimony. Furthermore, Petitioner's right to cross-examine Ellis on the issue was not limited given the fact that no deal was offered.  Tr. 2994-98.  The appellate court stated that the claims were reviewed in light of the evidence presented at the hearing but Petitioner had "failed to meet his burden of proving the requested relief should be granted."  Tr. 3331.  The Supreme Court of Louisiana denied writs without comment.  Tr. 3604.

### B. Trial Judge's Actions

Petitioner argues that the court should not have allowed Ellis to invoke the Fifth Amendment privilege at the preliminary examination.  First, an evidentiary error in connection with the preliminary examination does not entitle Petitioner to relief from his conviction obtained after trial.  Second, it appears the Fifth Amendment privilege was invoked at the hearing with respect to some correspondence that might have included incriminating statements and that the court held inadmissible.  Finally, whether or not there was a deal was fully explored later in the proceedings through pretrial motion practice and discussions at the trial.

Petitioner at one time complained that the trial judge improperly limited cross-examination at trial, but there is no evidence of such a limitation, and Petitioner appears to have abandoned that argument.  The trial judge did not place any limits on defense counsel's ability to cross-examine Ellis on this issue.  Counsel had available information about the pending drug charges, the bond reduction, and the like that he could have used to cross-examine Ellis, and the trial judge never prevented him from doing so.

### C. Brady Claim

Petitioner makes a related but substantively different argument that the State falsely represented that there were no favorable considerations or deal extended to Ellis in exchange for her trial testimony.  The prosecution may not suppress evidence favorable to an accused. Brady v. Maryland, 83 S.Ct. 1194 (1963).  The rule extends to impeachment evidence such as a promise by an assistant prosecutor that a witness would not be prosecuted if he testified at trial.  Giglio v. U.S., 92 S.Ct. 763 (1972).  This is different from a claim that the trial judge restricted cross-examination on possible grounds for bias or interest by the witness.  U.S. v. Bagley, 105 S.Ct. 3375, 3381 (1985) (making that distinction).  And this is not a case where it is alleged that the witness was asked about her expectation of leniency and testified falsely. Ellis was not asked about such matters at trial.  The only issue properly exhausted and presented by Petitioner is whether the State wrongfully suppressed evidence of a deal or promise to Ellis.

The state court explored this issue at trial and more thoroughly at the post-conviction hearing.  There was testimony that Ellis's attorney certainly hoped that she would be treated more favorably if she cooperated with the murder investigation, but no evidence was ever discovered that there was an actual plea offer, deal, or other agreement before trial.

The state court's adjudication of this claim on the merits included a factual finding that there was no such deal for the State to divulge.  Habeas relief is not permitted with respect to such a decision unless it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

State court findings of fact are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. § 2254(e)(1).  The state court made a reasonable determination that there was no agreement, bargain, or deal that the prosecution had to disclose before trial.  Petitioner has yet to point to any contrary evidence.

Petitioner is frustrated that Ellis may not have had an agreement with the prosecution but likely testified with the unspoken hope or expectation that she would receive favorable treatment in exchange for her testimony.  The State was not obligated to disclose that Ellis might have such a subjective hope.  The defense could have cross-examined Ellis about her pending drug charge, the possible penalties she faced, her release on bail after her preliminary testimony, the lack of a murder or burglary charge against her, and her subjective hope for leniency.  All would have been allowable grounds for cross-examination that were not excluded by the state court.  The defense did not pursue that line of questioning, but that does not make out a <u>Brady</u> claim against the prosecutor.[2]

**Fifth Amendment/Spousal Privilege**

Petitioner makes a confusing assertion that his Sixth Amendment right to present a defense was violated when the trial court allowed Noe Stephan's attorney to "invoke his client's Fifth Amendment right through the use of the spousal privilege, without first making

---

[2] Evidence is not "suppressed" if the petitioner either knew or should have known of the essential facts that would have permitted him to take advantage of any exculpatory evidence.  <u>West v. Johnson</u>, 92 F.3d 1385, 1399 (5th Cir. 1996).

a judicial determination of the questions to be ask[ed]."  The basis of the argument is not clear.

Mr. Stephan did not testify at the trial, and Misty Ellis did not invoke spousal privilege during her testimony.  There was testimony at trial from Stephan's attorney, Warren Thornell, who was asked about an affidavit that Stephan and Ellis asked that he prepare to reflect that they had been married since November 21, 2001.  Thornell did not invoke any privilege.  The state court rejected this claim, and Petitioner has not articulated the basis of the claim or how it amounts to a constitutional violation that will require his murder conviction be vacated.

**Ineffective Assistance of Counsel**

**A.  Introduction; Burden**

Petitioner argues that counsel was ineffective on numerous grounds.  To prevail on such a claim, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold.  Schriro v. Landrigan, 127 S.Ct. at 1939.  The Strickland standard is a general standard, so a state court

has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential." <u>Knowles</u>,129 S.Ct. at 1420.

"If this standard is difficult to meet, that is because it was meant to be." <u>Harrington</u>, 131 S.Ct. at 786.  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. <u>Id</u>.  Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id</u>.

### B.  No Motion to Quash

Petitioner argues that counsel should have filed a motion to quash his amended indictment on the grounds discussed above, that it did not comply with state law by charging a crime defined by a Louisiana statute.  This claim lacks merit because Petitioner cannot show prejudice.  The district attorney may amend and cure a charging instrument with the stroke of a pen.  If counsel had challenged the form of the amended indictment, there is little doubt that the prosecutor would have successfully corrected any technical mistake and brought Petitioner to trial. <u>Pickney v. Cain</u>, 337 F.3d 542 (5th Cir. 2003) (no prejudice shown when counsel did not move to quash an indictment that could have easily been reinstated).

### C.  No Motion for New Trial

Petitioner asserts that trial counsel filed a motion for new trial based on an alleged violation of the rule of sequestration.  The motion alleged that a confidential informant had informed counsel that an unknown individual used a cell phone to allow Ellis, Stephan, and

Catts to "listen to and discuss all testimony given during the entire trial" in violation of the rule of sequestration.  The trial court, in its ruling, stated that counsel withdrew the motion "when he had no witnesses to testify to the facts alleged regarding the use of a cell phone in the courtroom."  Relief was, accordingly, denied on the claim that counsel was ineffective for not pursuing the motion.  Tr. 2432.  Petitioner continues to press the argument in this court.  He argues that counsel should have issued subpoenas for phone records that would have supported the assertion.

The state court adjudicated this claim on the merits, so habeas relief is available only if that adjudication was an objectively unreasonable application of Strickland.  Habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits."  Pinholster, 131 S.Ct. at 1398.  Petitioner has not pointed to any material in the state court record, such as the identity of the informant or the name of the unknown person who employed the phone, that would support this claim.  It appears that counsel initially pursued the issue but abandoned it only after finding no evidence to support it.  The trial court was not unreasonable in denying relief on the claim.

### D.  Impeachment of Misty Ellis

Petitioner argued in his post-convention application that counsel was ineffective for not using all available material to impeach Misty Ellis.  The trial court rejected the claim based on a finding that it was fully litigated on appeal.  Tr. 2432-33.  That is not correct.  The appeal concerned whether the trial court improperly limited the cross-examination; it did not address a claim for ineffective assistance of counsel based on deficient examination.  The

appellate court did not rely on such a procedural issue.  It summarily rejected the claim based on Petitioner not meeting his burden of proving relief was warranted.  Tr. 2488.  That summary denial was the last reasoned state court decision, so it governs for habeas purposes and constitutes an adjudication on the merits that is entitled to deference under Section 2254(d).  Richter, 131 S.Ct. at 786.

Defense counsel cross-examined Ms. Ellis by asking her about changes in her story to police over time, whether she took drugs before talking to the police, whether she had a sexual and abusive relationship with the victim, and how an earlier effort to get her belongings from the victim's home resulted in a confrontation that she left crying.  Counsel got Ellis to admit she was afraid of the victim, pointed out inconsistencies in her prior statement and testimony about where the gloves were obtained, and had her admit that she and Noe Stephan had a close relationship.  He also developed through questioning of Ellis that Petitioner was gainfully employed and had a home and tools, while Ellis and Stephan were largely dependent upon others for room and board.

Petitioner lists several potential areas of questioning that he faults counsel for not pursuing.  They include matters such as perceived inconsistencies and statements about where Ellis was in the house at certain times, whose idea it was to get gloves, where the crowbar came from, when Ellis handled the crowbar, whether Petitioner got in the front or back seat after throwing items in the river, the color of the clothing they wore, whether Ellis heard the victim's truck arrive at the house, and the like. It was disclosed on direct examination that Ellis faced a charge of possession of Schedule II drugs in Caddo Parish.

Tr. 1707.  Petitioner faults counsel for not questioning Ellis about whether any deal was made or why she was not charged in connection with the murder.

Judicial scrutiny of counsel's performance must be highly deferential to avoid the distorting effects of hindsight.  The court must be wary of arguments that come down to a matter of degree, such as whether counsel conducted enough questioning on an area or investigated a particular issue enough.  The Constitution is not violated if one can come up with additional strategies or questions that counsel could have pursued.  It requires only that the attorney's performance be reasonable under prevailing professional norms.  Carty v. Thaler, 583 F.3d 244, 257 (5th Cir. 2009, citing Strickland and Yarborough v. Gentry, 124 S.Ct. 1 (2003).  The question is whether counsel's conduct so undermines the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  Id.

Counsel conducted a fairly extensive cross-examination of Misty Ellis and attacked her testimony on a number of grounds.  Petitioner has suggested other areas of questioning. Many of them are quite trivial when it is considered that Petitioner admits his trio participated in the crime in essentially the manner described by Ellis.  Petitioner's version of the events differs only with regard to his degree of participation in the crimes.  In assessing whether these additional questions might have affected the verdict, it must be kept in mind that Louisiana allows a second-degree murder conviction under its felony-murder rule if an act of the defendant or one of his accomplices causes the death of the victim during the commission of certain felonies, including aggravated burglary.  See State v. Turner, 138

So.3d 740 (La. App. 5th Cir. 2014) (participant in robbery was guilty of second-degree murder when victim was killed, even though it was not proved he was the participant who inflicted the fatal wound); State v. Luther McFarland, 960 So.2d 1132 (La. App. 5th Cir. 2007) (even an accidental killing during aggravated burglary would support second degree murder conviction); and State v. Morris McFarland, 960 So.2d 1142 (La. App. 5th Cir. 2007) (principal to aggravated burglary was guilty of second degree murder when killing was done by co-defendant).   The jury was instructed that it could return a verdict of guilty if the victim was killed while the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary even if he did not intend to kill or inflict great bodily harm.  The jury was also instructed on the law of principals.  Tr. 2037-38.

Reasonable persons might debate whether counsel should have pursued some of the lines of questioning suggested by Petitioner, and they could also argue as to whether pursuing such questions would give rise to a reasonable likelihood of a different verdict. Most of the suggested questions are regarding minor discrepancies that would not significantly undermine the witness's credibility or the verdict.  Petitioner's best argument is that counsel should have examined Ms. Ellis about whether a deal was made, why no charges were placed against her, and what she hoped to gain by testifying.  Counsel cannot be faulted for not asking about a deal because counsel and the court had been assured by the prosecutor that there was no deal.  Counsel could and probably should have asked Ellis more questions about whether her motivation to testify included avoiding a murder charge against herself or obtaining a benefit in connection with her pending drug charge, but perfection is

not required.  Other lawyers discussing counsel's performance would probably opine that other questions should have been asked, but that does not mean the state court was incorrect to find that counsel's performance was within the realm of a reasonable performance within the meaning of the Sixth Amendment.  Reasonable persons might debate the correctness of the state court's adjudication, but that room for debate means that habeas relief is not permitted on this claim.  Only extreme malfunctions in the state criminal justice system permit relief, and this decision does not reach that level.

### E.  Motion in Limine on Marital Privilege

Defendant counsel filed a motion in limine (Tr. 859-60) that noted Misty Ellis and Noe Stephan had indicated they were married after the crime and that Misty would refuse to give evidence in any criminal case against her husband.  Counsel cited L.C.E. Art. 505, which provides that in a criminal case a witness spouse has a privilege not to testify against the other spouse.  Counsel asked for a determination of whether the marriage was legitimate or whether any exceptions applied to the privilege.

Ellis testified at trial and never invoked the marital privilege as to any question.  Petitioner argued on post-conviction that counsel was nonetheless ineffective because he should have persuaded the court that the privilege did not apply to communications that happened before marriage.  He based his argument on L.C.E. art. 504, which governs confidential communications made during the marriage, but that privilege is more narrow than the broad one that applies under Article 505 in a criminal case.  In any event, counsel did attack the claim of privilege, and privilege was not invoked at trial.

The state court rejected this claim on the merits.  The trial judge added that defense counsel argued during closings that Misty Ellis had a motive to lie about Petitioner's participation in the crime because she wanted to protect her husband.  Tr. 2433, 2021-22. Petitioner argues to this court that if counsel had done a better job of challenging the privilege he could have called Noe Stephan to the stand and forced him to either testify or invoke the Fifth Amendment, which Petitioner believes would have been compelling before the jury.  His argument is confusing, speculative, and not well founded in law.  He certainly has not set forth anything that counsel did or did not do with respect to the privilege issue that was so ill advised that it ran afoul of the deferential <u>Strickland</u> standard.  This court cannot say that the state court's denial of this claim was an objectively unreasonable application of <u>Strickland</u>.

**F.  April Lanier**

Petitioner argued in a supplemental post-conviction filing that counsel was ineffective for failing to call April Lanier as a defense witness.  Tr. 2326-2352.  He submitted an affidavit from Lanier, signed long after the trial, in which she stated that she spoke to police investigators and a defense investigator.  Lanier testified that she believed she would be called as a witness, but defense counsel never contacted her.  Lanier said she would have testified that she met Misty Ellis when she began dancing at Action Central.  Lanier described Ellis's alleged drug use, difficult personality, and disputes that Ellis had with Lanier and other women.  She described Ellis as having a history of using men to get what she wanted and acting out violently when she did not.  Lanier said that Ellis "mooched off"

Mr. Gilbert, who was similarly used by a number of other dancers.  Lanier said she witnessed the couple argue, that Ellis said she wished she could kill Gilbert and get away with it because he had beat and raped her, and she saw what appeared to be rope burns on Ellis. Lanier went on to offer hearsay about purported conversations between Misty Ellis and other people about obtaining their help in killing Gilbert.

Petitioner argues that Lanier's testimony would have impeached Ms. Ellis's testimony by showing that she had a motive to kill Gilbert Moore before going to the house, and Petitioner was simply a pawn in the events.  The trial court acknowledged this claim but found it did not meet the <u>Strickland</u> standard.  The court noted that Petitioner admitted breaking into the victim's home without permission, after which the victim was killed in his presence.  That was largely sufficient to merit his conviction under the felony-murder doctrine.  Tr. 2435-37.

Much of what Petitioner says would have been gained through Lanier's testimony was admitted to by Ellis during cross-examination.  Defense counsel got her to admit that she and the victim had a rocky relationship that had involved tears, physical confrontations, and anger.  Lanier's testimony would have been cumulative of that evidence.  Other portions of her affidavit would have been inadmissible under the trial court's ruling that excluded matters such as Ms. Ellis's drug use, employment history, and similar matters.  Other aspects of her proposed testimony would have been inadmissible hearsay about alleged conversations between Ellis and other persons who are not parties to the case.  Given these factors, the state

court's adjudication of this claim was not an objectively unreasonable application of Strickland.

### G. Testimony Preparation

Petitioner argued in his supplemental post-conviction application that counsel was ineffective because he did not properly prepare Petitioner to testify a trial.  Petitioner says counsel abandoned efforts to develop the defense after Petitioner rejected a plea offer of manslaughter and 40 years.  He contends that a meeting was set to record Petitioner's testimony, but counsel said he did not discuss testimony before trial and walked out of the meeting.  Petitioner says that this resulted in him taking the stand without proper preparation, and his novice efforts were prejudicial.  Tr. 2355-56.

The trial court noted that Petitioner did not take counsel's advice on the plea offer so likely would have ignored his advice regarding his testimony.  It was Petitioner's choice to testify, and once he made his decision, he took the risk that his testimony would be interpreted as incriminating.  Tr. 2437-38.

Counsel might have made a reasonable decision to avoid rehearsing the testimony so that it did not sound rehearsed and artificial.  Even if the Constitution compelled that his performance include practice testimony or similar preparation, Petitioner has not articulated how such practice might have changed his testimony in a way that could have resulted in a different verdict.  The state court did not act unreasonably in denying this claim.

### H.  Failure to Investigate and Call Witnesses

Petitioner's post-conviction application put his <u>Strickland</u> arguments under the heading of Claim 4.  The heading asserted that counsel failed to investigate, failed to call witnesses, and failed to present available defenses.  It then set forth a general discussion of <u>Strickland</u>, followed by the specific arguments addressed above.  Each of those arguments was given a separate heading A, B, C, or given specific treatment in the supplemental application.  There was no specific discussion of the alleged failure to investigate, present an available defense, or call witnesses (other than April Lanier).  Tr. 2279-86.  Writ applications to the appellate and Supreme Courts followed that same pattern.

Despite the lack of separate labeling, the trial court devoted discussion to the general assertions found in the heading.  It rejected the claims because Petitioner did not show what facts more investigation would have revealed that might have changed the outcome, did not identify witnesses or show what their testimony would have been, and did not identify any available defenses that might have changed the verdict.  Tr. 2431.

Petitioner's memorandum that accompanies his federal petition lists the same heading but adds, for apparently the first time, specific assertions intended to support the claims.  He says, for example, that if the investigation would have included a visit to the crime scene counsel would have been able to impeach Ms. Ellis's testimony about what she could have heard from her location in a closet.  He identifies for the first time six witnesses other than April Lanier who he says could have helped the defense.  He contends that two of the witnesses would have disputed the testimony of Melissa Quick that Petitioner admitted his

involvement in the crime, one would have testified that the prosecution attempted to get the witness to testify that Petitioner tried to sell him the victim's tools, and one would have testified about Petitioner's mental health treatment that might have supported an insanity defense.  Petitioner also faults counsel for not subpoenaing medical records regarding treatment for mental illness and drug overdose.

Petitioner did not make any of these specific arguments in the state court, and he did not file in the state court any affidavits or other evidence to support these contentions.  The state court adjudicated this claim on the merits, so habeas review is limited to the record that was before the state court. <u>Pinholster</u>, 131 S.Ct. at 1398.  Petitioner may not attempt to flesh out the conclusory claims he presented the state court by submitting new evidence in the federal court. <u>Pape</u>, 645 F.3d at 288 (it was error for federal court to hold hearing to flesh out a <u>Strickland</u> claim adjudicated in state court).  And, other than April Lanier, none of the listed witnesses have provided affidavits consistent with Petitioner's assertions about how they would have testified.  The state court, based on the record before it, reasonably denied the conclusory claims of failure to investigate, call witnesses, and present defenses.  Habeas relief is not available on this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 10th day of March, 2015.

Mark L. Hornsby
U.S. Magistrate Judge